STATE of Wisconsin, Plaintiff-Respondent,

v.

Danny A. REYNOLDS, Defendant-Appellant.

Court of Appeals

*No. 01–0498–CR. Submitted on briefs November 7, 2001.—
Decided December 4, 2001.*

2002 WI App 15

(Also reported in 643 N.W.2d 165.)

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Peter M. Koneazny*, assistant state public defender.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *James E. Doyle*, attorney general, and *Shunette T. Campbell*, assistant attorney general.

Before Fine, Schudson and Curley, JJ.

¶ 1. SCHUDSON, J. Danny A. Reynolds appeals from the judgment of conviction for second-degree sexual assault of a child, entered after revocation of probation,[1] and from the circuit court order denying his subsequent motion for resentencing or sentence modification. He argues that he is entitled to resentencing because the judge who sentenced him after revocation, who was not the judge who presided over the trial and ordered his probation, erred in imposing a "severe" ten-year sentence without reviewing the trial testimony, the presentence investigation report, or the sen-

---

[1] A judgment of conviction previously had been entered for this offense on November 8, 1996, following the initial sentencing hearing. That judgment is not at issue in this appeal.

tencing judge's "findings" from the original sentencing proceeding.[2] Reynolds requests that this court reverse the order denying his motion, vacate the postrevocation judgment of conviction, and grant him resentencing.

¶ 2. We conclude that because the sentencing-after-revocation record does not reflect the sentencing judge's awareness of the information in the presentence investigation report, and of the factors the trial judge found significant in deciding that Reynolds' case was an exceptional one justifying the withholding of sentence, resentencing is appropriate. Accordingly, we reverse and remand for resentencing.[3]

## I. BACKGROUND

¶ 3. Reynolds was the executive director of the Open Door Community Center, a government-funded family services agency. In 1996, in a trial before Judge David A. Hansher, a jury found Reynolds guilty of

[2] Reynolds also argues that the judge who sentenced him after revocation erred in basing the sentence on the "impermissible factor that he attacked his accuser's credibility at trial," and erroneously exercised discretion by: (1) ignoring the trial judge's "findings" regarding the severity of the offense; (2) basing the ten-year sentence on "unsupported and misleading representations that [he] was a serious re-offense risk"; and (3) placing undue emphasis on his failure to communicate with probation authorities, as an indicator of bad character. And Reynolds also argues that he received ineffective assistance of counsel who failed to raise some of these issues and confront some of these alleged misrepresentations at the sentencing after revocation.

[3] Resolving the appeal on this basis obviates the need to address Reynolds' other arguments, some of which may come to be considered at his resentencing. *See Gross v. Hoffman*, 227 Wis. 296, 300, 277 N.W. 663 (1938) (only dispositive issue need be addressed).

second-degree sexual assault of a child, for his fondling of a thirteen-year-old boy who, following his mother's death, had been living with Reynolds.

¶ 4. At the sentencing on November 8, 1996, after considering a presentence investigation report, the recommendations of counsel, letters and statements from various persons on behalf of Reynolds, and Reynolds' remarks, Judge Hansher placed Reynolds on probation for five years with various conditions, including that he perform two hundred hours of community service and serve six months in the House of Correction with work-release privileges.[4] Judge Hansher noted that he was taking the unusual step of withholding sentence, rather than imposing and staying a sentence. Judge Hansher explained that the offense was "on the lower end of considering how outrageous it is," and further observed:

> So even though it's a second[-]degree sexual assault, I will consider the circumstances, and I did hear

---

[4] The judgment roll states, "Defendant is to serve 1 year less 8 days in the House of Correction," but, as reflected in the transcript of the November 8, 1996 sentencing hearing, Judge Hansher actually stated:

The Court initially considered up to a year at the House of Correction.

What the Court is going to do is still impose some House of Correction time with work-release. The Court is going to make it six months House of Correction with work-release instead of a year.

The judgment roll error, repeated in the November 9, 1999 court memo prepared by Reynolds' probation agent for the sentencing after revocation, was noted by defense counsel; the memo's error was corrected by the sentencing-after-revocation court.

the testimony during the trial, so I'm well aware of all the facts and circumstances.

. . . .

. . . I think because of his lack of prior record and his involvement in the community, instead of having an imposed and stayed sentence, the Court is going to withhold sentence. I agree with [defense counsel] that if there's a violation here, I think a court would like to look at it, to view it rather than having him go off to prison. I think it should come back to court. I try to avoid withholding sentences because most likely if there's a problem, it's going to be in front of another judge who takes over this calendar and they say, ["]I know nothing about this case,["] and the argument is always made to me at felony judges' meetings, ["W]e impose and stay[ sentences.] We shouldn't withhold.["] But I think there are exceptions and this is one of them. So I'm going to withhold sentence.

¶ 5. Reynolds appealed. During the pendency of his appeal, Reynolds' incarceration at the House of Correction was stayed and his probation was held in abeyance. Reynolds then moved to Indiana where, according to his affidavit, he worked with community programs and was employed as a nurse in a nursing home and as a "home health care provider." However, following this court's affirmance of his conviction, *see* *State v. Reynolds*, No. 97–1129–CR, unpublished slip op. at 4 (Wis. Ct. App. Oct. 5, 1998), Reynolds did not report to his probation agent. Almost one year later, he was arrested in Indiana after being stopped for driving with an expired license plate. Reynolds then was returned to Wisconsin and his probation was revoked.

¶ 6. On March 9, 2000, sentencing after revocation took place before Judge Daniel L. Konkol. Judge Konkol had received the November 9, 1999 court memo

prepared by Reynolds' probation agent, recommending that Reynolds receive "the maximum term of incarceration consecutive to any sentence."[5] Judge Konkol also heard from the prosecutor and defense counsel, both of whom commented on Reynolds, the victim, and the circumstances of the crime. The prosecutor recommended ten years in prison; defense counsel requested significantly less confinement—one year in the House of Correction, with credit for time already served, and one year of house arrest. Reynolds declined to address the court.

¶ 7. Sentencing Reynolds, Judge Konkol noted that he had listened to the comments of counsel and had reviewed the criminal complaint, the information, and the November 9, 1999 memo. Judge Konkol then recited the required sentencing criteria and commented: "First of all, in looking at the gravity of the offense, *this is an extremely serious offense.*" (Emphasis added.) He added that "it's *particularly aggravated* because the victim was a vulnerable victim at age thirteen" whose mother had died and who had been "placed to live with the defendant and almost cut off from his family." (Emphasis added.) Rejecting the probation agent's recommendation for the maximum incarceration, twenty years, and accepting the State's recommendation for ten years in prison, Judge Konkol commented:

---

[5] The State does not dispute Reynolds' characterization of the probation agent's memo as: (1) "merely a report on his monitoring Mr. Reynolds' file and his unfounded judgment that Mr. Reynolds should be punished severely for not complying with probation rules"; (2) "mak[ing] no reference to familiarity with the facts of trial or the earlier sentencing proceedings or documents"; and (3) "no substitute for a [presentence investigation report]."

In looking at the character of the defendant, he has no prior record, and I think it's also important to note that while this matter was pending to today's date he still has not accumulated any new convictions since the time of the . . . original hearing where he was placed on probation.

The defendant apparently is someone who has done good works in the community. He is someone who has been attending college, so he's an educated person. He will be turning 49 next month. He's someone who apparently has a good work history.

In this circumstance, however, he was given quite a break by the sentencing judge to have probation with House of Correction time. He did not take advantage of that opportunity, and not only does it seem that[, according to the defendant,] the victim was to blame for . . . this, but now also the Probation Department is to blame because they didn't go and seek him out in scouring the country to see where he may be.

Apparently . . . the appeals court must be at fault too because they didn't go and seek him out to tap him on the shoulder and tell him that his conviction was affirmed, so that . . . he better start reporting to the Probation Department.

My point is everybody else is responsible for Mr. Reynolds except Mr. Reynolds. That's not something this court is willing to entertain. . . .

. . . I think that he has to learn that society does not look favorably upon people that are not individually responsible, especially when he wants to be in work that would be assisting other people.

. . . .

In looking at the need to protect the public, this is the type of situation where the defendant in effect gets

convicted of this very serious offense and simply for the most part just walks away thinking there would be no consequence. That's very scary because that may encourage him to get involved in further criminal activity and do further attempts to make sure that victims feel that it's their fault so there might not even be any type of coming forward by victims to report what has been going on.

. . . .

In looking at the gravity of the offense, the character of the defendant, the need to protect the public, I feel that confinement is necessary to protect the public from further criminal activity of the defendant. I feel he does need correctional treatment that's available only in confinement. I haven't heard one thing about any . . . type of sexual offender treatment that he's undergone while he has been out of confinement. Looks like he really did not address those types of issues.

## II. DISCUSSION

¶ 8. When considering a challenge to a sentence after revocation, we review both the original sentencing and the sentencing after revocation "on a global basis, treating the latter sentencing as a continuum [sic] of the first." *State v. Wegner*, 2000 WI App 231, ¶ 7, 239 Wis. 2d 96, 619 N.W.2d 289, *review denied,* 2001 WI 43, 242 Wis. 2d 545, 629 N.W.2d 784. Where the same judge presides at both proceedings, the judge "should reference the prior sentence" at the sentencing after revocation, *id.* at ¶ 9 n.3, but need not "restate the reasons supporting the original sentencing" because "we will consider the original sentencing reasons to be implicitly adopted," *id.* at ¶ 9. Where, however, a different judge sentences after revocation, we have no basis for assuming that the second judge has acknowledged or adopted

the reasoning of the first, absent either an explicit statement to that effect or a record otherwise demonstrating that that is so.

¶ 9. In sentencing after revocation, therefore, when the judge is not the one who presided at the original sentencing, it is particularly important that the judge, "[l]ike the appellate court, . . . be able to rely upon the entire record, *including the previous comments at the first sentencing." Id.* (emphasis added). And, in some cases, this may become all the more important where a trial has given the original sentencing judge a close view of the evidence.

¶ 10. As the supreme court observed many years ago, in a case where the sentencing judge had not presided over the trial, when sentencing discretion is required; "there might be some reason for saying that the judge who pronounced the sentence should be acquainted with the circumstances of the case as disclosed at the trial, in order to award the proper degree of punishment." *Pegalow v. State*, 20 Wis. 61, 62 (1865). Here, particularly given Judge Hansher's and Judge Konkol's significantly different comments on the severity of the offense, we are not satisfied that the sentencing after revocation was based on "accurate, complete and current information," *see State v. Carter*, 208 Wis. 2d 142, 157, 560 N.W.2d 256 (1997), and a full understanding of "the entire record, including the previous comments at the first sentencing," *see Wegner*, 2000 WI App 231 at ¶ 9.

¶ 11. While Judge Konkol's comments were well-considered in many respects, they reflected no recognition of the trial testimony, the presentence investigation report, or Judge Hansher's sentencing comments

on the severity of the offense. That information was essential to a fair sentencing after revocation. After all, the criminal complaint and information could not convey the evidence subsequently presented at trial. And the probation agent's memo, prepared for the sentencing after revocation, did little more than summarize the case history; it did not provide the comprehensive study typically offered in a presentence report.

¶ 12. Judge Konkol, in a lengthy written decision denying Reynolds' motion for resentencing or sentence modification, carefully traced Reynolds' arguments and, with implicit reference to Judge Hansher's reasoning, attempted to reconcile the two proceedings. In part, he wrote:

> [T]he defendant presented a different picture to the court at the post[]revocation sentencing hearing based upon his failure to maintain contact with the probation department and what the court perceived was an attempt to simply walk away from any responsibility for this offense. The court, therefore, was not bound to rely on the sentencing findings made by Judge Hansher, and its basis for departing from those findings is sufficiently set forth in the record.

While these comments have some merit, they still fail to allay our concerns in this case.

■

¶ 13. The supreme court has explained that "a circuit court should, in imposing a sentence at a resentencing proceeding, consider all information relevant about a defendant, including information about events and circumstances either that the sentencing court was unaware of at the initial sentencing or that occurred after the initial sentencing." *Carter*, 208 Wis. 2d at 146. It certainly is clear, therefore, that in sentencing after revocation, a court may determine that conduct follow-

ing the first sentencing hearing casts a defendant in a very different light. *See North Carolina v. Pearce*, 395 U.S. 711, 723 (1969) ("[E]vents subsequent to the first trial . . . may have thrown new light upon the defendant's 'life, health, habits, conduct, and mental and moral propensities.' "); *Denny v. State*, 47 Wis. 2d 541, 545, 178 N.W.2d 38 (1970). Indeed, in some circumstances, such subsequent conduct could substantially alter a court's view of a defendant's character or danger to the community. Rarely, however, could *subsequent* conduct, resulting in revocation, allow for a reassessment of the severity of the specific criminal conduct for which a defendant was convicted and is being sentenced.

¶ 14. Therefore, while Judge Konkol was not "bound to rely" on all Judge Hansher's "sentencing findings" (and indeed, while Judge Hansher, in explaining why he decided to withhold Reynolds' sentence, anticipated the need for a subsequent court to evaluate Reynolds in light of whatever might have led to revocation), Judge Konkol was required to be informed of the trial record and Judge Hansher's assessment, based on the evidence, of the severity of Reynolds' crime. *See Wegner*, 2000 WI App 231 at ¶ 9; *see also Denny*, 47 Wis. 2d at 543 ("Reasons for sentencing are not findings."). Here, the record does not establish that Judge Konkol, at the sentencing after revocation, was aware of critical information conveyed by the trial testimony, the presentence report, and Judge Hansher's sentencing comments. *See Denny*, 47 Wis. 2d at 546 (holding that a court, when resentencing, "should have before it the transcript of the original sentencing and the reasons for the sentencing should appear therein," and noting "the importance of a copy of the presentence investigation, when used by the trial judge").

¶ 15. Accordingly, we reverse the postrevocation judgment of conviction and the circuit court order denying Reynolds' motion for resentencing or sentence modification. We remand for resentencing and, given the unusual circumstances of this case, we order that the resentencing be before Judge Hansher.[6]

*By the Court.*—Judgment and order reversed and cause remanded with instructions.

¶ 16. FINE, J. (*concurring*). Although I agree with the majority opinion, I write separately to decry what I see as the unfairness of a system of justice that is essentially random, and to suggest a possible solution. Wisconsin's Code of Judicial Conduct recognizes that judges have special responsibilities to help make the law more fair and more consistent: "As a judicial officer and person specially learned in the law, a judge is in a unique position to contribute to the improvement of the law, the legal system, and the administration of justice, including revision of substantive and procedural law and improvement of criminal and juvenile justice." SCR 60.05(2), Comment. This case is a prime example of inconsistency and unfairness. And it is not because the Honorable Daniel L. Konkol is "tougher" than the Honorable David A. Hansher. *Au contraire.*

¶ 17. First, the facts of this case. As the majority recounts, Danny A. Reynolds was convicted of touching

_____

[6] We acknowledge, however, that because we are remanding for resentencing, Reynolds has the right to request judicial substitution. *See* WIS. STAT. § 971.20(7) (1999–2000) ("If an appellate court orders a new . . . sentencing proceeding, a request [for substitution of judge] may be filed within 20 days after the filing of the remittitur by the appellate court, whether or not a request for substitution was made prior to the time the appeal was taken.").

the penis and nipples of a thirteen-year-old boy through the boy's clothing. According to the State's evidence, after the boy indicated that he wanted Reynolds to stop, Reynolds never touched the boy indecently again. Reynolds denied the accusation, and the pastor of the church that both Reynolds and the boy attended testified that the boy told him that " 'nothing happened' " when he was asked about the incident.

¶ 18. Following Reynolds's conviction by a jury, Judge Hansher pointed out during the sentencing hearing that there can be "various degrees of sexual assault":

> There's cases that are outrageous. There are cases that are less outrageous. I'll put this, I agree, on the lower end of considering how outrageous it is. It involved the touching of the victim's nipples and also rubbing his penis over his clothing.

As the majority recounts, Reynolds's probation was revoked because he did not maintain contact with his probation agent. Reynolds was *not* revoked because he committed a new crime—either of a sexual nature or otherwise. Yet, Judge Konkol sentenced Reynolds to ten years in the Wisconsin State prisons.

¶ 19. At first blush, it might appear that the randomness about which I complain is the disparity in sentencing that one might expect from different judges applying the same criteria, but viewing the facts through their own lenses of experience and philosophy. In any system other than one vesting sentencing decisions in a machine or, as in the federal system, in machine-like sentencing guidelines, such disparity is expected. The only safeguard we have is careful appellate review to ensure that sentencing courts consider the appropriate factors. But, of course, mere application of the appropriate factors does not guarantee equality

811

of result; almost any sentencing that is within the statutory range will be upheld as a permissible exercise of the sentencing judge's discretion as long as he or she applies the appropriate factors in an appropriate way.

¶ 20. Our system also permits disparate treatment of different defendants when they appear before the *same* judge. In my view, this case and *State v. Ascher*, No. 00–0426–CR, unpublished slip op. (Wis. Ct. App. May 8, 2001), http://www.courts.state.wi.us/html/ca/00/00–0426.htm, which I describe below, are textbook examples of what is wrong with our criminal-justice system. They also light a path for reform.

¶ 21. In *Ascher*, the defendant was sentenced by Judge Konkol to two years in prison for the brutal beating, disfigurement, and rape of the defendant's wife. The following are excerpts from my concurring opinion in that case, where we upheld Judge Konkol's sentence, against the defendant's challenge that the two-year sentence was "too harsh":

> According to a criminal complaint filed against Ascher by the Milwaukee County District Attorney, the victim was married to Ascher, and wanted to leave him but was afraid that he would beat her if she tried. Indeed, according to the criminal complaint, Ascher had beaten his wife brutally and often. He had also used a razor blade to carve his initials on one of her breasts, because, according to what he told her, he owned her and could kill her anytime he wanted.
>
> The criminal complaint recites that one day in March, 1998, as she was making dinner, Ascher came up behind her and indicated that he wanted to have sex with her. When she demurred, he returned with a rope, tied her to a chair, yelled at her that he owned her, took her into their bedroom, tied her hands behind her back, and raped her. Afterwards, according to the criminal

812

complaint, he "untied her and threw her naked into the garage and locked the door." She spent the night in the car.

Some two weeks later, again according to the criminal complaint, Ascher, angry at his wife for studying, "took a 3–pound hand weight and hit her in the lower back area which caused her legs to go numb and caused her to fall to her knees, at which point [Ascher] took the weight and hit her left ribs and hip." Several weeks later, he cut his initials into her breast while she was showering. Still later, over the Easter weekend, he hit her, kicked her, and threw her against a dresser because he was angry that she was studying.

The criminal complaint charged Ascher with false imprisonment, a Class E felony punishable by a maximum of two years imprisonment, *see* Wis. Stat. §§ 940.30 & 939.50(3)(e) (1997–98), and mayhem, a Class B felony punishable by a maximum of forty years imprisonment, *see* Wis. Stat. §§ 940.21 & 939.50(3)(b) (1997–98). The complaint did not charge any degree of sexual assault or battery.

On May 4, 1998, Ascher's wife testified at a preliminary examination. An information was filed on May 7, 1998, and again charged Ascher with false imprisonment and mayhem. On March 3, 1999, the case was plea bargained.

In reciting the terms of the plea bargain, the prosecutor said that Ascher would plead "no contest" to the two-year felony of false imprisonment, and that the prosecutor would ask the trial court to dismiss the mayhem charge, the forty-year felony. He told the trial court that the victim, who was no longer married to Ascher, had "no objection" to the deal. The prosecutor explained that "this whole process had made [the victim] – she's very fearful of the process," explaining that circumventing the need for her to testify would "sav[e]

her a lot of pain, both emotional pain and pain in having to relive what happened here." The prosecutor represented to the trial court that plea-bargaining the case was in the victim's "best interest."

The prosecutor also explained that in his view "the charge on count one is adequate to protect the interest of the community in that it is a felony," noting that despite all of the things Ascher did to his former wife, the prosecutor did not believe that Ascher was "a danger to anyone else in the community." He also explained that a defense-retained polygraph examiner had concluded that Ascher was telling the truth when he denied cutting his wife, although he conceded that polygraph evidence was not admissible in Wisconsin courts.

The trial court accepted the plea bargain, took Ascher's no-contest plea to the false imprisonment count, dismissed the mayhem charge, and ordered a presentence report, which the parties had jointly recommended. The presentence report is in the appellate record. It indicates that the person who wrote the presentence report "tried to contact [the victim], but calls were not returned." The report notes, however, that in one of her earlier statements the victim said that "she is fearful for her life, and afraid he will hurt her again," but that "she did not want anything bad to happen to her husband, she just wanted him to get some help."

The presentence writer reflected that she did not "get the impression that [Ascher] participated in the physical abuse" of his former wife, noting that the case seemed atypical of domestic abuse cases because "he did not appear to have any issues with power and control within the marriage" and because there were not the "numerous calls to police before charges are actually filed." Additionally, the writer noted that Ascher had, in the writer's word, "passed" the lie detector test, calling

the lie-detector results "[o]ne of the most convincing facts" in support of her view that Ascher was not guilty.

The victim appeared at Ascher's sentencing. The prosecutor contradicted the implication in the presentence writer's report that the victim had failed to return her "calls":

> I talked to [the victim] about that, and she said that sometime earlier this week, she received a voice message on her machine, at 9:45 a.m. from the presentence writer who said she needed to talk to [the victim] regarding this incident. But she needed to talk to her by two p.m. that day and that was the deadline.

> Well, [the victim] works and goes to school and didn't get home until that evening, hours after apparently the deadline had passed. That's the only efforts the presentence writer made to contact her.

The prosecutor also explained to the trial court that the presentence writer never attempted to contact him, nor did she speak with any of the victim's friends or relatives who knew of the long history of abuse and had seen the bruises and scars. After reciting briefly what the victim had endured, the prosecutor opined that: "This is a case of an abused woman who fits the whole profile of an abused woman, especially a woman who is of a professional stature and is trying to keep up face in her profession, and at school and at work." The prosecutor also told the trial court that he believed that Ascher raped his wife and threw her naked into the garage, and that he had "no doubt that these incidents, as horrible as they were, actually did occur." He noted: "People don't treat animals that badly."

Although the prosecutor had told the trial court at the plea hearing that he had plea bargained the case in

part because Ascher had done well on the defense-arranged lie detector test, he now told the trial court that he believed that Ascher "has certain psychological aspects to his make up" that would enable him to "beat" a lie detector test.

The victim spoke to the trial court. I reprint her brief remarks in full:

> Um, Your Honor, I'm not quite sure how to even go about starting there. Because I thought about talking about what had happened to me over the past year and a half and throughout my years of marriage and, um, you know, I look at it in the sense that if I say all the details and I say how it affected my life and I say how it affected my family, um, there's a self satisfaction that he gets.
>
> And if I say I'm doing a great job working on a Ph.d. I'm teaching and I'm surviving, and it doesn't affect me, then it looks like, you know, whatever he did has no impact on my life and I just go on and walk away.
>
> I lost a lot. I lost a man that I loved. A six year marriage. I've lost a second family. I've lost both people I considered dear friends to me because of him.
>
> Um, I've lost self esteem, I've lost integrity. I have to explain scars to strangers, you know, renting an apartment, oh my gosh, what happened to your arms? Um, I have to, I mean I wanted children by the time I was thirty. I wanted a family. That was all something that I had hoped for.
>
> Right now, one of my friends even said to me, how do you know after everything

816

you've been through you can even have children? I don't know. Um, I didn't want to come forward. I didn't want anybody to know. Its embarrassing, its obscene. Its a reflection on me, um, its a reflection on his family. That's not fair to them.

Um, I don't think anything that happens today will make me feel better. I don't think there's anything I can recommend. I've been in counseling. It's going to take a lot for me to get my wits back about me. But all I can say is I don't want to see this happen to anybody else.

I don't want to see his family have to go through it again. And maybe some day he can make a better life for himself. That's all I have to say. Thank you.

*Id.* at 1122 (Fine, J., concurring). When Ascher addressed Judge Konkol before sentencing, Ascher denied the accusations and complained about the nightmare he had been through. *Id.* at 23.

¶ 22. *Ascher* was plea bargained. Judge Konkol dutifully accepted the prosecutors request that he dismiss the mayhem charge. This left Ascher with a maximum two years of prison exposure. Judge Konkol imposed the two years, but less than the maximum fine ($2,000 rather than $10,000) because he believed that Ascher does have some positive aspects in his life. *Id.* at 24. As noted, we upheld Ascher's sentence over his objection that it was unduly harsh.

¶ 23. The bottom line to all of this is that Judge Konkol gave Reynolds a ten-year sentence for transient touching over clothing, but gave Ascher two years for crimes that are so horrific that they are off the scale.

¶ 24. If we are to have a system of justice that is fair and not random we must, in my view and although I have not been a supporter of sentencing guidelines in the past, install some system that will result in similar sentences for defendants with similar levels of culpability and recidivism potential. Further, and most important in my view, and I have written about this many, many times, we must eliminate plea bargaining. Plea bargaining permits expediency to trump justice; plea bargaining tramples fairness for the victim and, often, for the defendant. Unless we do both of these things (any form of sentencing guidelines without the elimination of plea bargaining moves discretion from the judge to the lawyers), we will never even approach a system of justice that ensures both that guilt shall not escape or innocence suffer. *See Berger v. United States*, 295 U.S. 78, 88 (1935).